HARTZ, Circuit Judge,
dissenting:
I respectfully dissent. The Supreme Court opinion providing for qualified immunity in “extraordinary circumstances” despite the violation of clearly established law, Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), gives little guidance on what circumstances are “extraordinary.” The majority may well have construed the term correctly. But the very concerns expressed in Harlow suggest to me that Sheriff Reed is entitled to qualified immunity.
Recognition of qualified immunity balances the interest in vindicating the rights of a victim injured by a violation of law against the “social costs” of suits against government officials: “the expenses of litigation, the diversion of official energy from pressing public issues, ... the deterrence of able citizens from acceptance of public office, [and] the danger that fear of being sued will ‘dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.’ ” Id. at 814, 102 S.Ct. 2727 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (L.Hand, J.)) (second brackets in original).
Before Harlow, qualified immunity was unavailable if the official “knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury.” Id. at 815, 102 S.Ct. 2727 (internal emphasis, brackets, and quotation marks omitted). But requiring proof of the subjective element of this defense “frequently ha[d] proved incompatible with [the] admonition ... that insubstantial claims should not proceed to trial.” Id. at 815-16, 102 S.Ct. 2727. The official’s subjective good faith was a question of fact that ordinarily could not be resolved by summary judgment. Id. at 816, 102 S.Ct. 2727. Not only did officials therefore have to bear the burden of trial, but also the issue could justify searching, burdensome discovery of the official’s thought processes. Id. at 816-17, 102 S.Ct. 2727.
To ease these burdens Harlow held “that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Id. at 818, 102 S.Ct. 2727. “Reliance on the objective reasonableness of an official’s conduct, as measured by reference to clearly established law,” the Court explained, “should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.” Id.
Thus, the purpose of the objective clearly-established-law test was to act as a shield to protect public servants from litigation, not as a sword to impose liability on them. The Court recognized, however, that the clearly-established-law test also "can serve as the standard for imposing liability. The traditional qualified-immunity test had denied immunity when the official knew or reasonably should have known that the action was unlawful, id. at 815, 102 S.Ct. 2727; and the Court observed that “[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.” Id. at 818-19, 102 S.Ct. 2727. At this point the Court introduced *1237 the exception to the clearly-established-law test that we grapple with in this case: “Nevertheless,” it said, “if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.” Id. at 819, 102 S.Ct. 2727.
It seems to me that the meaning of extraordinary circumstances must be examined in light of the policies underlying the Harlow decision. The policy behind Harlow’s objective test was to permit prompt termination of litigation that is unlikely to succeed. Overly strict application of that test, however, could undermine the policy of protecting reasonably competent public officials from litigation. Given the complexities of the law today, it should not be surprising to find intelligent, conscientious, well-trained public servants who do not know all the clearly established law governing their conduct. The statement in Harlow that reasonably competent public officials know clearly established law, id. at 818-19, 102 S.Ct. 2727, is a legal fiction.
Nevertheless, the objective test; and the legal fiction it embraces, can advance the policies behind qualified immunity if the extraordinary-circumstances exception is properly understood. The extraordinary-circumstances exception should encompass those situations in which the legal fiction does not make sense and applying that fiction would create problems that qualified immunity is intended to avert. In my view, this goal can be advanced by including as an extraordinary circumstance the official’s reliance on specific advice by a nonsubordinate attorney of sufficient stature regarding the specific challenged action. Although, as I previously stated, it Is doubtful that reasonably competent public officials actually know all the clearly established law governing their conduct, it is largely true that reasonably competent public officials are sufficiently versed in the law that they know not to take certain actions without seeking proper legal advice. If they violate clearly established law without having sought legal advice, holding them liable makes good sense. But there is little sense in holding officials liable for unlawful action that received the imprimatur of properly sought legal advice. The Harlow legal fiction should not be extended to say that reasonably competent public officials know when the legal advice they receive is contrary to clearly established law.
Moreover, to extend the legal fiction that far would undermine a critical purpose of qualified immunity — reducing “the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties.” Id. at 814, 102 S.Ct. 2727 (internal quotation marks and brackets omitted). Surely public policy favors the practice of public officials seeking legal advice regarding questionable practices. Is it wise to hold those officials liable when they follow that advice? When the proper discharge of the official’s duties requires action, do we want the official to flinch in acting — because of fear of litigation — -even after counsel advises that the action is lawful? Thus, in my view, incorrect legal advice is an extraordinary circumstance cloaking an official with qualified immunity when, as here, it comes from the highest level nonsubordinate attorney with, whom the official is to consult and the attorney is fully informed of the planned action and the surrounding circumstances.
As I understand them, this court’s precedents are consistent with this view. We have recognized four considerations in determining whether reliance on counsel con *1238 stitutes extraordinary circumstances: “[1] how unequivocal, and specifically tailored to the particular facts giving rise to the controversy, the advice was, [2] whether complete information had been provided to the advising attorney(s), [3] the prominence and competence of the attorney(s), and [4] how soon after the advice was received the disputed action was taken.” V-1 Oil Co. v. Wyo. Dep’t of Envtl. Quality, 902 F.2d 1482, 1489 (10th Cir.1990) (internal citations and footnotes omitted). The relevance of the first two considerations is obvious: the official is not entitled to rely on advice unless the official has provided the attorney with all relevant information and the advice authorizes the specific action taken by the official.
The third and fourth factors — the stature of the attorney and the time to take action — are interrelated. One should seek the best possible legal advice that time allows. For example, if immediate action is required, there may be time to consult with only an assistant city attorney; if the assistant has expertise on the applicable law, it may be appropriate to rely on the assistant’s advice. I would reject Ms. Lawrence’s argument on appeal that the extraordinary-circumstances test cannot apply here because there was no need for Chief Reed to act immediately. Chief Reed consulted with the City Attorney. What was the Chief to do with the extra time — go to the law library to check whether the City Attorney had misread the cases?
I disagree with the majority’s reading of our precedents as requiring the public official to discuss the pertinent law with the advising lawyer. In the real world — not the world of legal fictions — officials, even the most competent of them, go to counsel with an idea of what they want to do and inquire whether there is some law (constitutional, statutory, regulatory, or case-based) that prohibits or restricts them from doing so. The attorney does not need the official’s legal advice or argument to reach a conclusion. What is important is whether the official provides all relevant information concerning both the problem and the intended course of conduct.
I suspect that the greatest hurdle for Chief Reed is the Supreme Court’s use of the term “extraordinary circumstances” in delineating this exception to the clearly-established-law rule. How can one view the seeking of legal advice as extraordinary? Public officials do it, and should do it, all the time. It truly is an extraordinary circumstance, however, when a public official is prevented from knowing a clearly established legal proposition because the official is misdirected by a fully informed chief counsel. It certainly appears that reported cases are rare.
Perhaps some may fear the possibility of collusion between the public official and the government attorney, with the official seeking a free pass from the attorney for conduct they both know to be unlawful. This fear of collusion is one reason why reliance on advice from private counsel that conduct is lawful is not a defense to crime under the Model Penal Code § 2.04 and in almost every jurisdiction. See 1 Wayne R. LaFave, Substantive Criminal Law § 5.6(e)(4) (2d ed.2003). On the other hand, the Model Penal Code § 2.04(3)(b)(iv) recognizes a defense for reasonable reliance on “an official interpretation of the public officer or body [who undoubtedly relied on government counsel] charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense.” And surely the risk of collusion is less when turning to a nonsubordinate government attorney than when relying on a private attorney paid by the person seeking clearance. Moreover, the government *1239 attorney who may be tempted to shield a public official from liability would likely be deterred by the risk of his or her own liability in authorizing a specific unlawful act despite being fully informed of the circumstances.
In the present case Sheriff Reed fully informed the City Attorney of the relevant surrounding circumstances and how he intended to proceed. The City Attorney gave his imprimatur. It would be contrary to Harlow’s underlying concern about “dampening] the ardor of all but the most resolute, or the most irresponsible public officials, in the unflinching discharge of their duties,” 457 U.S. at 814, 102 S.Ct. 2727, to tell officials like the sheriff that they cannot rely on their chief nonsubordinate government attorneys but must postpone action (to conduct their own research or call a professor at the nearest law school?) or risk being sued.
I would affirm the judgment below.